Due process does not permit a criminal defendant to be convicted as a proxy for gangs or for the dangers that gangs pose to society in general. The Sixth Amendment of the Constitution entitles defendants to an attorney who will make reasonable efforts to ensure that that does not occur. But unfortunately, in this case, Mr. Saldivar did not get the benefit of either of these protections. He was convicted of first-degree murder with two special circumstances and sentenced to life without parole as a proxy for gangs and their crimes. The way that this happened is apparent from virtually every segment of the trial transcript in this case. The prosecutor's tactics run from the opening argument through the closing, and they were these. The prosecutor lacked any clear evidence in this case of what Mr. Saldivar actually did with regard to the crime. The evidence showed that he was present at the time the murder occurred. He destroyed evidence after the fact, tried to conceal the crime from others, including gang members. Nor did any evidence show that he had the intent to rob the victim for his car. In fact, no evidence showed what Mr. Saldivar's actual role in the crime was. Well, there's no question that there were, in my mind at least, definitely issues along the way, but we're on EPA review, so that makes it tougher for you. Is there one particular error that you think is the most egregious that you want to focus on, or is this more of a cumulative error question, and then of course we have to talk about prejudice? Correct. You're right. This is definitely a cumulative error problem. I don't think that it's productive to look at any of the prosecutor's many forms of inflammatory evidence in isolation. They all worked together, and I think it's instructive to look at the errors that the California Supreme Court actually found to be error in this case, because there were at least three failures to object by trial counsel that were found to be deficient performance. Let's just talk about those for a second. First of all, trial counsel failed to object to extensive testimony about the Mexican Mafia being at warfare throughout California, controlling street gangs from the prisons, race-based conflicts, violence and intimidation by the Mexican Mafia, which he then linked to Saldivar by talking about his X13 tattoo. That was found to be deficient performance. Second, there was a deficiency by failure to object to a .41 caliber handgun, which was actually, I'd like to point out for your honors how pervasive this handgun was in this case, and not just the handgun, but the testimony about it being delivered by Mr. Saldivar's fellow gang members to Victor and Cizo. This was basically, this was not just an isolated mention. This was sort of a counter-narrative, a sort of a shadow narrative that existed alongside the crime in this case and sort of pervaded the prosecutor's argument, suggesting that Mr. Saldivar had somehow, had used this gun for some improper purpose. I wanted to just... But counsel, during the argument though, in closing, he repeatedly said to the prosecutor, this was not the gun used in the killing. I think actually that exacerbates the prejudice from this. That was not the gun used in this killing, but the way that the prosecutor continually referred to this gun was that this was used by Saldivar in some other way about which the jury is not hearing. He started this in opening argument. He made two references to the 41 handgun in opening argument, and in fact, he said, without any supporting evidence, there was no evidence in the trial that Mr. Saldivar ever held or used that gun for any reason, but the prosecutor actually falsely stated that he did. Page... Excuse me, I'm just going to find the page for one second. In page 41, it said, this is the prosecutor's opening. You are going to hear that there were two guns. One was a black gun, a big revolver. That's the 41. No evidence ever actually showed that Mr. Saldivar had that. The other was a silver gun, also a big revolver, the murder weapon. You're going to hear that the defendant was packing around those guns in the days and weeks prior to Mr. Yese and being executed. That was not supported by any evidence, but it formed a framework by which the prosecutor was able to then bring in extensive evidence about this other gun, the black 41, that was repeatedly... It was in evidence. It was shown to the jury many times. There was extensive evidence from Detective Brown about how this gun, after the fact, it was brought to Mr. Enciso's house, and this was repeated over and over again. Counsel, is it accurate? I think this is in your brief, that the prosecutor, in closing argument, actually said to the jury, there are facts about this case that you do not know? That's right. There are facts about... There was no objection to that. There was no objection to that, but I think this, once again, just ties into, from the very start of the case, there's a 41 that was supposedly possessed by Saldivar, without evidence, extensive evidence about the delivery of this gun to Enciso and how this was part of the investigation for some unknown reason. Then he said, this is relevant to show what happened in this case about guns. The testimony from Brown about the delivery of the 41 to Enciso was basically in the context to show that Saldivar is a high-ranking gang member, the kind of gang member who possesses this type of a gun, a gang gun, and uses it to commit violent shootings. That was the substance of Detective Brown's testimony about the delivery. But in any event, yes, it says there's evidence you don't know. After trial, feel free to come up to talk to me or Mr. Morial, the defense attorney, and ask us about this information. We can tell you after the trial. But this is all sort of feeding into this narrative of Saldivar as a violent, sinister, OG, high-ranking gang member who uses a gang gun like this 41 to commit other crimes. Your opposing counsel is going to stand up and say the state court said this was a prejudice question and there was insufficient prejudice, let's assume deficient performance on certain issues by the defense attorney. She's going to say, for example, your client was overheard saying we had a 187 someone yesterday. Walk us through why the district court, the trial court, I'm sorry, the district court and the state court's prejudice analysis was incorrect. Let's talk about that. First of all, Your Honor, what was said was not that we had a 187 someone. It was that something happened and there had to be a 187. So that was what the statement actually was. But yes, the prejudice was overwhelming and very severe. I want to talk first about the purpose for which this was used by the prosecutor. It was not used to talk about either of the elements of the STEP Act 186.22 gang enhancement. Those elements are, was the defendant an active participant in a criminal street game? Was it for the benefit of, at the direction of, or in association with a gang? Those purposes were not those for which this evidence was used. It was used in the prosecutor 11 times in closing argument to argue that, not that this was a gang-related crime, because this evidence about sexing in women, jumping in, crossing out graffiti, had nothing to do with this crime or whether this crime was a gang-related crime. Okay? What he argued was that because gangs are so bad and dangerous and Mr. Saldivar is a violent OG, he had to have committed the murder or directed it. I guess my question here is, focus on the evidence. They're going to go up there and say, this evidence, the statement about the 187, the shell casings, the keys, the fact the car was taken to a chop shop, all that stuff was overwhelming evidence of guilt, no matter what happened, no matter how bad the attorney was in this case. So why are they wrong as to those, I'd like you to deal with why those pieces of evidence maybe are not as powerful as they're suggesting they are. So let's, guilt, now I'm not talking about the special circumstances because I think the prejudice as to the special circumstances was egregious. But as to guilt, yes it was overwhelming because the argument for Mr. Saldivar's guilt was, we don't know who did what in this case, he just disposed of evidence after the fact. But you can fill in the blanks and conclude that because he's a violent OG, you can't believe that he was just present. That's not believable. Violent OGs and gang members are the ones who commit crimes and shoot people with gang guns. That was actually the prosecutor's argument that he made. And I also want to focus on the California court's prejudice analysis. What it said was, the evidence that this was a robbery, a murder in commission of a robbery was overwhelming. That is actually, that is an unreasonable conclusion. That's an unreasonable application of Strickland to find that the evidence of a robbery, felony murder was overwhelming. It was not. If the car was simply taken to conceal the murder and get away from the murder, that is purely incidental to- But wasn't there evidence that they took the car to a chop shop and got money for it? Yes, exactly. And I think that weighs against, well, not Mr. Saldivar, Olivares only is the one who got money for it. Saldivar had almost no role in the chopping, didn't take any part of the car, and didn't take any money from that. But he did accompany the car to the chopping and help take it apart, didn't he? Yes, he did. But as to guilt, guilt of what? Guilt of second degree murder and intentional murder, deliberate and premeditated murder, I want to focus on the first degree, premeditation. He made a threat prior to the murder, shortly before the murder. He specifically made the threat, right? A month before the murder, he said to Mr. Tejeda, if the victim does not stop disrespecting Sujay in front of her young daughter, he's going to be attacked. This happened- Wasn't there another incident in which the young woman that the petitioner seemed to want to protect from Yassayan's advances, the same thing happened again, right? Shortly before the murder took place, isn't that correct? Maybe a week before? There was evidence that that happened a week before. It was not shown whether- I don't believe it was shown whether Mr. Saldivar was present for that. But I want to focus also on that, though. The statement was that if he doesn't stop disrespecting her in front of her daughter, she's going to be attacked. So this is not a clear gang-related- this idea that the woman who was being disrespected was gang property or this was an affront to the gang, that really isn't consistent with his statement. What he was upset about was the disrespect in front of her daughter and also, as explained in the briefs, there was no evidence that she was a gang member or a gang girlfriend that would make her gang property. But just sort of returning to the question of prejudice, I think it's important to look at prejudice as to what? As to the gang's special circumstance, as to the robbery's special circumstance, as to first-degree deliberate and premeditated murder, or as to second-degree murder, intentional murder. I think you have to analyze each of those separately. I think as to the gang's special circumstance, there was overwhelming prejudice from the evidence that was introduced that had nothing to do with whether the facts of this case posed a gang-related reason. I want to refer your honors to the California case of People v. Killebrew, which says that even where there is a Step Act gang enhancement allegation, Evidence Code 352 prejudice analysis is still active. Gardley, the case that the California Supreme Court cited, or the California Court of Appeals cited, to excuse this evidence, it is still subject to Section 352. In Killebrew 103 Calap 4th, 644, the court said, the trial court apparently interpreted Gardley as allowing police officers who testify as experts on gangs to state any opinions they may have about gangs and gang activities. Not so. Gardley remains limited by Section 352, and in fact, Gardley itself talked about Section 352 still having a role in limiting experts' testimony, even where there is a gang allegation. And Alboron talks about that, too, how this evidence that's not related to the facts of the case, just about gangs, their practices, and their gang violence in general, had no legitimate purpose in that case, even though in Alboron there also was a Step Act allegation. On the prejudice issue, how do you deal with the evidence that the petitioner, in the presence of two others who I gather were witnesses at the trial, threw into the river some shiny objects that turned out apparently to be, perhaps, bullet casings, one of which was consistent with a bullet that was found at the scene of the murder? It was the same make and caliber as the, yes, there was Mr. Chuck Rolliff who testified to that, but once again, the defendant destroyed evidence. The fact that he destroyed evidence after the fact runs counter to a gang purpose, because the only gang purpose that was asserted for this is that the gang will get notoriety and publicity that will enhance its reputation and status for violence. You don't want to get caught, though. I mean, if that's the case, then why would gangs ever want to try to threaten witnesses? Okay, well, here's, I don't know, Your Honor, but let's also talk about the fact that Mr. Saldivar told a fellow gang member not to talk about it. Jose Preciado was a hard-times gang member who saw Mr. Saldivar immediately before the murder. He went to that same gang member the next day and said, you remember that car you saw the night before yesterday? You didn't see nothing. And cases, including Alboron, including Bresenia v. Scribner cited in the briefs, talk about exactly this. If there's no evidence of claiming graffiti publicizing the crime, no evidence of throwing gang signs or saying gang names during the crime, none of which we have here. We have the opposite. We have concealment. That weighs against a gang purpose. People v. Ochoa, 179 Cal App 4th, 650, talks about that, too. Defendant did not call out a gang name, display gang signs, wear gang clothing, and gang graffiti while committing the instant offenses. No evidence of bragging or graffiti to take credit for the crime. Concealment not just to police, but also to fellow gang member, and also even to Muniz, Mr. Muniz, who's a neighborhood resident. They go to take the car. They don't tell him, hey, this was used to kill another gang member. They don't tell him that. They say, no, we need to chop this up because we, you know, they gave an excuse about a girlfriend. It was my girlfriend's car. We can't make the payments anymore. So they're not trying to publicize this to anybody, even neighborhood residents. They go out of, far outside gang territory to kill Mr. Yesein. He's not a gang rival. The one comment, stop respecting in front of her little daughter, is not really related to any kind of a gang purpose. So I think the evidence of gang purpose is extremely weak. Evidence of robbery purpose, also extremely weak. An incidental taking of the car, purely incidental to robbery, people versus green. That does not mean that there is a felony murder. Evidence of premeditation and deliberation. Once again, the evidence weighs quite strongly against that. Mr. Saldivar allowed himself to be seen leaving with Mr. Yesein. The car made a U-turn. He said, something happened. There had to be a 187. He didn't say, I did the 187. And the next day, he seems to regret having been seen the night before with Mr. Yesein and tries to hush it up. So I think, once again, the evidence on all of those prongs was quite weak. And I see my time is up. Thank you. Two minutes on the clock for rebuttal when you come back. Thank you, Your Honor. Good morning, Your Honors, and may it please the court. Deputy Attorney General Meredith White on behalf of Respondent. I want to start with, I think, the sort of overarching theme with this case, which is the importance of context. And the importance of context with respect to the trial record. I'm going to answer Your Honor's question first, which is, did the prosecutor say in his closing argument that there were facts the jury was not aware of? That comment has been taken out of context. And what the prosecutor said at the very beginning, his closing argument was broken up over two days. And at the very beginning of the second day, he said, we talked about it in voir dire, there may be loose ends with this case. And you promised in voir dire that you could decide the case on the facts before you, even if there are loose ends or unanswered questions. He said, I think as opposing counsel referenced, you know, at the end of the trial, if you still sort of have those questions about those loose ends, feel free to come talk to us. There may be things that, you know, the defense attorney and I can tell you. It's a very odd thing for a prosecutor to say, isn't it? You're not defending that suggestion that if there are things that you still want to know about the case, come talk to us. I've never heard of such a statement. Well, and I think, but again, if you look at the paragraph immediately following that, what he references is what happened to Ruben Oliveros, which was, who was the co-defendant in this case. And there had been tons of testimony about the witnesses and their testimony in a previous trial, in Ruben's trial. Oliveros was clearly involved in this as well. And the prosecutor was, excuse me, concerned that they may have lingering questions about what had happened to Oliveros. Had he been convicted? What happened in his trial? That is the context in which the prosecutor made this statement. So it's not quite fair to say the prosecutor was inviting the jury to sort of rely on facts not before them because there were things they didn't know that had happened. I think this is clear from the prosecutor's comment. In that statement, excuse me, he immediately says that the jury has to, you've agreed, you are going to decide this case on the facts presented before you, which is correct. And that was his reminder to the jury, that whatever your questions are about Ruben Oliveros and what happened in his trial, put those aside because you agreed you were going to decide this case on the facts before you. That's correct. And in context, that comment, I think, has been unfairly represented as the prosecutor's urging the jury to sort of trust him, wink, wink. There are facts you don't know about this case that contribute to Saldivar's guilt. That's not quite a fair representation of the comment when it's read in context. So again, the same is true with respect to the .41 caliber gun. It's true that the prosecutor said repeatedly that that .41 caliber gun, there was no evidence that it was used in the murder. There is evidence from witnesses that the defendant was carrying around two weapons in the weeks prior to this crime. One of them, very clearly, and witnesses testified, was a silver or chrome revolver. They never found the silver or chrome revolver. All they found was the .41 caliber gun. The victim was shot twice. He was shot once to the back of his head, and as the medical examiner explained, it was a non-fatal wound. It did not penetrate the skull. He would have been rendered unconscious, and he would have fallen to the ground. It was the second shot, right to the back of his head that went through his brain, that was the fatal shot. And it was that shot, that's the bullet that they recovered at the scene. And that's the bullet that the ballistics expert testified was a .357 Magnum bullet. That's the one that tied to the shell casing that the defendant threw into the river. And a .357 is consistent with what witnesses had described as the silver or chrome revolver. So the .41 was relevant to explain that the gun that fired the fatal shot was most likely the silver or chrome .357 weapon that the defendant had been seen with in the weeks immediately preceding this crime. That was all relevant to show either he was the direct perpetrator and used the gun that he'd been carrying to shoot and kill Yassayan. Or it was relevant to show he was aiding and abetting in that he provided his silver or chrome revolver to the person who ultimately fired the fatal shot. It's true that we don't know who fired the fatal shot, and the prosecutor said that over and over again in his closing argument. He had to prove that either the defendant was liable as a direct perpetrator, or the defendant was liable as an aider and abetter. And all of this was relevant to show that his involvement in this crime was not merely a passive bystander who happened to, you know, show up at this scene and whoops, somebody committed a murder. That's, he had to prove beyond a reasonable doubt that that's not how this went down. The gang evidence similarly has to be understood in that context, which is the gang evidence was relevant to show that in a gang context, if you're at a scene like this one with the OG or shot caller of a gang, the likelihood that he's a passive bystander not participating in a murder is very slim. And so the gang context was relevant to show that he was an aider and abetter or a direct perpetrator. I think all of that is well within appropriate use for gang evidence when it is a crime like this one that is a gang crime and was committed for a gang motivated purpose. On top of which, I think opposing counsel sort of tries to paint the picture that this was not a gang crime. The defendant had obvious visible gang tattoos, including one across the back of his head. He didn't exactly need to announce at every crime scene that it was a gang that, you know, the name of his gang or claim it at every crime scene because he has it tattooed across the back of his head. He committed the crime with two other active participants of his criminal street gang. There was evidence regarding the threat he issued to the victim in the weeks prior to the murder. There was evidence regarding, you know, him being seen in the car hours before it. He placed a phone call to a witness on his way to the murder scene within a half mile of the murder scene from the victim's car asking for money so he could get to L.A. later. That phone call happened necessarily before the murder took place showing from the very beginning they intended to take that car and go to L.A. And of course they did because what were they going to do? Take the victim in his car to a remote location, shoot and kill him and then leave the car there? I think it strains credulity to suggest that they did not intend to take this car from the very beginning. I want to talk briefly again that sort of gets back to the purpose for which this evidence was used. And the opposing counsel mentioned some of what's been characterized as overly prejudicial gang evidence about jumping out, sexing in, graffiti, that kind of thing. All of this was admitted to show the nature and circumstances of gangs and how they operate. And that is to say that committing crimes in a gang context is often done as a group. It's often done sort of supporting one another and aiding and abetting one another. The expert testified about the importance of backing up, the importance of sort of participating as a team. And all of that was highly relevant to show that this was not Oliveros sort of off on his own committing a crime with which the defendant had no involvement. That's just simply not how crimes occur in the gang context. And so it was the gang evidence here I think also in contrast to cases like Alboron and cases like some of the others that are cited in the briefing. This was not just a crime committed that had an attached gang enhancement. This was a crime committed with a gang motive. So all of the evidence about gangs was relevant to show not just the gang enhancement and to prove the elements of the gang enhancement. It was relevant to prove the motive of the crime, the intent of the actors, all of the sort of more substantive pieces. And I think again, once that is understood, if you look at the defense attorney's closing argument, it becomes very clear what his tactic was. He, first of all, the first thing he said. What's the motive? The motive is to protect the woman, I forget her name. Suji Toscana, yes. Toscana. Yes. The motive is to protect Toscana, right? That's the motive that the prosecutor attributed to the crime. Yes. I think the motive was to answer a disrespect to Toscana. It wasn't necessarily protection. So if that motive specifically was to address the disrespect when the victim tried to hit on Ms. Toscana, what does all the general practices of sexing in, jumping in, out, what does all of that have to do with the specific motive in this case? I think that's where your opposing counsel is coming from, that the over-inclusiveness of all of the gang culture evidence posed a risk that the jury would convict just because he's part of this very violent crime with these unsavory practices, rather than focusing in on the specific motive and whether there was a plan to kill the victim prior to the actual 187 being committed. Certainly. And I'd like to answer the question in two parts. The first is what that evidence, how it was relevant to motive. And the second is to sort of talk a little bit more about the defense attorney's tactic in not objecting to the admission of some of this evidence, which again, that's the issue before this court, is whether the defense attorney was ineffective for failing to object to the admission of that evidence. The motive, and opposing counsel sort of makes much of the fact that Toscana was not a girlfriend, and so this couldn't have been the motive for the crime because the gang expert testified this only applied to gang girlfriends. That's not quite accurate. If you read the gang expert's testimony, what he said was, women are considered property within the gang and they will sort of be protective and answer disrespects to gang girlfriends all the way down to a girl that a gang member thinks he might be dating, but isn't dating or she's not dating him. So it wasn't the notion that gangs protect or answer disrespects to gang girlfriends. The gang expert's testimony was not limited to just exclusively identified gang girlfriends. It was girls that are associated with the gang in lots of different ways. So, and Toscana clearly met that definition. Even if she wasn't technically somebody's girlfriend, she was definitely associated with the gang and she would have fallen into the class of females that they felt they needed to answer a disrespect for. The sexing in was relevant to show that again, they commit crimes together, that women are considered sort of property and that contributes to their answering disrespects for it and the use of women in that manner. In this particular case, there was some evidence that Saldivar was using Toscana and some of the other women to keep Yesayan interested and hanging around because he had money and drugs and he had this very nice car. The same was true with respect to Chargolov, one of the other witnesses that Saldivar was using women to sort of entice them, women that they were interested in to keep them kind of coming around and keep making use of whatever it was that, whatever particular thing they had to offer. The prosecutor talks about that in the closing argument. I think the second piece of the question is the defense attorney's tactic in not objecting to the admission of those pieces of evidence. The defense attorney went in knowing that this was a gang case and that he had to convince the jury to look at the evidence objectively despite the fact that it was a gang case. And if you read his closing argument, that's exactly what he did. He took those pieces of evidence, those women as property and the use of the 41 and the opening piece of his closing argument is the prosecutor admitted this evidence to scare you and to frighten you so that you would not do what you promised to do, which was to look at the evidence objectively. And he goes through that. I think he very effectively used those things to convince the jury that they needed to, despite his client's involvement in a gang, which he could not deny, despite that, they still had to assess the evidence of his aiding and abetting of the murder. And he concedes the- You think that, you think given the strategy of arguing that despite the fact that this is a gang related or a gang crime to still look at the facts objectively, that that would be much more effectively carried out if you limit the admission of the various gang pieces of evidence as much as you can. I think that that's a disagreement as to tactics and that does not establish an effective assistance of counsel. I think in this case, if you read the defense attorney's closing argument, you know, in total, he very effectively sort of communicated to the jury that, you know, the prosecutor is really, doesn't have anything. He doesn't have anything to show that Saldivar was actually participating in the crime. And you can tell he has nothing to show that because he has trotted out all of these irrelevant facts in front of you to scare you and frighten you into convicting him without enough evidence. Counsel, why wouldn't, if that was the objective, why wouldn't the attorney ask the judge to give an instruction to which he was entitled, reminding the jury that they're not to consider all of this gang evidence as evidence of character or disposition? That would have served the purpose that you attribute to the defense attorney. Yes, and I agree. I agree that he should have requested that limiting instruction. The California Court of Appeal also concluded he should have requested that instruction. That conclusion was reasonable. And again, on edpedeference, the task here is whether the California court's determination of these issues is unreasonable. Plainly, it's not. That tactic used by the defense attorney is sort of seen throughout his closing argument. The gang context was also something he needed. He argued that Saldivar was guilty as an accessory because he had destroyed evidence, the shell casings and chopping up the car. And the defense attorney argued that he needed the gang context to explain why somebody would participate in destroying evidence of a murder after the fact. And he argued he did that for all the reasons that the gang expert told you, which is loyalty to his gang. He sort of needed to participate in that way. He said Saldivar is an accessory after the fact, but he is not an aider and abetter. So he not only needed the gang context and needed some of that gang expert testimony, but again, I think he very effectively used the inflammatory pieces of evidence to his advantage. All of this demonstrates that this was part of a bigger tactic and that the California Court of Appeals decision that these did not constitute deficient performance because there was a rational tactical reason is a reasonable application of Strickland. I see that my time has expired. Let me see if my colleagues have any additional questions. Thank you very much. Thank you, Your Honors. Thank you, Your Honors. I want to address just a couple of points. First, the California Court of Appeals decision and why it's not entitled to deference under AEDPA. The Court of Appeals simply did not address the question at hand, which was whether counsel was deficient for failing to object on any basis or seeking to limit this extraordinarily extensive plethora of gang evidence. It said this evidence is relevant, guardly, and ended its inquiry. It did not address whether a 352 objection should have been given, whether counsel was inefficient for not seeking to limit it under 352 as unduly prejudicial. That's the question we have at hand. This court in Kratz v. Smith said the fact that a defendant may have committed another murder, as the prosecutor tried to say in this case through Mr. Saldivar's tattoos, that is so prejudicial. It's relevant. And in fact, in Kratz v. Smith, counsel was deficient for saying, I'm not going to object because it's relevant. The court said, that is unreasonable. Counsel should have raised a 352 objection. This kind of evidence is so extraordinarily prejudicial. There is no reasonable basis for not objecting, or at least even trying to keep it out under 352. I want to talk also about this idea that counsel had a tactical basis for letting in all of this extraordinarily prejudicial evidence. As Your Honor noted, counsel's strategy in closing was to say, all this evidence came in, and you shouldn't consider it. It's too prejudicial. If that was his tactic, why not lay the framework for that way earlier in the trial by at least lodging some objection, requesting limiting instruction? In Alboron, there was a limiting instruction, and the court held it was still too prejudicial to introduce evidence of unrelated gang evidence. Counsel, it seems to have been an afterthought by counsel to kind of wake up in closing argument and say, don't consider any of this evidence that I didn't object to throughout the whole course of this trial, because you shouldn't consider it. And in fact, this idea that counsel needed the evidence to show that Mr. Saldivar was an accessory after the fact, not an aider and abetter, that's also completely unreasonable, because it was the precise gang evidence that the prosecutor used to argue that he was an aider and abetter. The primary purpose for which the prosecutor used this gang evidence was to say, Mr. Saldivar could not have been merely present. He had to have directed the killing, aided and abetted, or committed it himself, because he's an OG and a violent gang member. So this idea that this somehow helped to show that he was merely an accessory after the fact simply doesn't hold water. Actually, over time. OK. Thank you very much. Thank you very much, counsel. All right, the matter is submitted for a decision by this court, and we are adjourned for the day.
judges: Lipez, Nguyen, Owens